AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20)   ☐ Original   ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Central District of California

FILED
CLERK, U.S. DISTRICT COURT
2/2/2025
CENTRAL DISTRICT OF CALIFORNIA
BY: _____ vv _____ DEPUTY

| United States of America | |
|---|---|
| v. | Case No. 2:25-mj-00430-DUTY |
| NADIA LORAINE THOMAS, | |
| Defendant | |

## CRIMINAL COMPLAINT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about January 31, 2025, in the County of Los Angeles in the Central District of California, the defendant violated:

| *Code Section* | *Offense Description* |
|---|---|
| 21 U.S.C. § 841(a)(1) | Possession with Intent to Distribute Methamphetamine |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

/s/ Dylan Greer
Complainant's signature

Dylan Greer, HSI Special Agent
Printed name and title

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: 1:52 pm

Judge's signature

City and state: Los Angeles, California   Hon. Margo A. Rocconi, U.S. Magistrate Judge
Printed name and title

AUSA: Joseph S. Guzman x2438

**AFFIDAVIT**

I, Dylan Greer, being duly sworn, declare and state as follows:

### I.   PURPOSE OF AFFIDAVIT

1. This affidavit is made in support of a criminal complaint against Nadia Loraine THOMAS for violating 21 U.S.C. § 841(a)(1): Possession with Intent to Distribute Methamphetamine.

2. This affidavit is also made in support of an application for a warrant to search the following cellphone (the "SUBJECT DEVICE"), in the custody of Homeland Security Investigations ("HSI") in El Segundo, California, as described more fully in attachment A: An Apple iPhone seized from THOMAS' belongings.

3. The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of 21 U.S.C. § 841(a)(1) (possession with intent to distribute controlled substances), 21 U.S.C. § 953(a) (unlawful exportation of controlled substances), 21 U.S.C. § 960 (knowing exportation of a controlled substance), 18 U.S.C. § 554 (knowing exportation of any merchandise contrary to any law), and 21 U.S.C. § 846 (conspiracy and attempt to distribute controlled substances) (the "Subject Offenses"), as described more fully in Attachment B.  Attachments A and B are incorporated herein by reference.

4. The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and

witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and search warrant and does not purport to set forth all my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. BACKGROUND OF THE AFFIANT

5. I am a Special Agent with United States Department of Homeland Security ("DHS"), Immigration and Customs Enforcement, Homeland Security Investigations ("HSI") and have been so employed since June 2023. I am currently assigned to the HSI Office of the Assistant Special Agent in Charge in El Segundo, California, as part of the Los Angeles International Airport Express Consignment and Freight Forwarding group, which is responsible for investigating drug trafficking violations involving passengers, outbound mail, air cargo, and ocean freight shipments. I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(c), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant.

6. During my tenure as a Federal Criminal investigator, I have completed approximately 350 hours of instruction at the Federal Law Enforcement Training Center in Glynco, Georgia, and completed the Criminal Investigations Training Program.

7.   Following CITP, I completed Homeland Security Investigations Special Agent Training ("HSISAT").  HSISAT consisted of approximately 350 hours of training in handling HSI-specific investigative cases that include but are not limited to Worksite Enforcement, Human Trafficking, Drug Smuggling, and Money Laundering.

8.   Through my training, I have learned of HSI's criminal investigative authority, as well as investigative techniques. HSI is responsible for enforcing federal criminal statutes prohibiting, among other things, the international distribution of and possession with intent to distribute drugs, in violation of Title 21 of the United States Code.  During my employment with HSI, I have investigated the smuggling of drugs through passengers and air cargo into and out of the United States.  I have assisted with the execution of search warrants to seize evidence of violations of federal and state law, as well as arrest warrants to apprehend individuals who have committed such violations.

9.   Prior to my tenure at HSI, I worked as a Task Force Agent with the Georgia Bureau of investigation, a Special Agent of the Criminal Investigations Division of the Georgia Department of Corrections, and a Community Supervision Officer for the Georgia Department of Community Supervision.  I have a combined law enforcement experience of approximately 7 years conducting investigations utilizing similar methods used in this investigation.  In addition, I possess a Bachelor of Science in Psychology from the University of North Georgia.

### III.  SUMMARY OF PROBABLE CAUSE

10. On January 31, 2025, THOMAS attempted to travel from Los Angeles International Airport (LAX) to Sydney, Australia, on United Airlines Flight UA 839, which was scheduled to depart LAX at approximately 10:40 p.m.  THOMAS checked one suitcase onto the flight.

11. During secondary inspections of THOMAS' checked suitcase, United States Customs and Border Protection ("CBP") LAX Officers identified anomalies.  CBP Officers conducted a further search of the suitcase and found approximately 17 sealed black plastic bags containing a white crystalline substance.  The white crystalline substance was later tested using the Thermo Scientific Gemini Analyzer, which yielded a positive result for methamphetamine hydrochloride.  The suspected methamphetamine weighed a total of approximately 18.12 kilograms.

12. When questioned about the suitcase, THOMAS admitted to CBP Officers that the suitcase belonged to her.

13. At the time of her arrest, THOMAS possessed the SUBJECT DEVICE and admitted the device belonged to her.  Law enforcement agents searched the SUBJECT DEVICE and observed messages regarding her transportation of the suitcase.

### IV.  STATEMENT OF PROBABLE CAUSE

Based on my involvement in this investigation, my conversations with other law enforcement officials involved in this investigation, and my review of reports and records connected to this investigation, I am aware of the following:

**A. THOMAS Possessed 18.12 Kilograms Of Suspected Methamphetamine Inside Her Checked Luggage.**

14. On January 31, 2025, LAX CBP discovered approximately 18.12 kilograms of presumptive methamphetamine inside the checked luggage of passenger Nadia Loraine THOMAS. According to CBP, THOMAS was scheduled to fly to Sydney, Australia on United Airlines Flight UA 839 on January 31, 2025, at 10:40 p.m.

15. According to CBP, THOMAS was selected for an outbound enforcement examination as part of CBP's international flight screening protocols, which are based in part on current narcotics smuggling trends from Los Angeles to Australia.

16. CBP conducted an outbound inspection of THOMAS' checked luggage. The initial X-ray examination of the suitcase revealed an anomaly. CBP then conducted a physical examination of the suitcase. During that physical search of THOMAS' suitcase, CBP found 17 sealed black plastic bags containing a white crystalline substance. The substance was tested using the Thermo Scientific Gemini Analyzer.[1] The test yielded a positive result for methamphetamine hydrochloride. The 17 bags weighed a total of approximately 18.12 kilograms.

17. Images depicting the 17 sealed black plastic bags found in THOMAS' suitcase are attached below:

---

[1] Based on my training and experience, I know that the Thermo Scientific Gemini Analyzer is a machine that allows one to scan drugs through a container and is capable of identifying the type of narcotic being tested.

5



18.     On January 31, 2025, I arrived at the CBP Secondary Examination Area in the Tom Bradley International Terminal (TBIT) at LAX.  I was informed that THOMAS was detained in a holding room by CBP.  Upon arrival CBP informed me that CBP detained THOMAS at gate 72A after she scanned her ticket and began to board the plane.  She was transported to the CBP Secondary Examination Area in TBIT for further inspection.

19.     Once in the CBP Secondary Examination Area in TBIT, THOMAS was shown the checked luggage, which included a luggage tag bearing tag number 4016861296 and THOMAS' name.  CBP informed me that THOMAS stated that the luggage belonged to her.

20.     Once THOMAS claimed ownership of the suitcase, CBP opened the suitcase directly in front of her.  After THOMAS observed the contents of the suitcase, she attempted to deny ownership of the bag.

6

21. Images depicting the United Baggage Tag bearing tag number 4016861296 and displaying the name Nadia THOMAS on THOMAS' checked suitcase are attached below:

 

### B. THOMAS Admits She Knew Her Luggage Contained Controlled Substances.

22. On February 1, 2025, at approximately 12:03 a.m., HSI LAX Special Agent Steve Yoon and I interviewed THOMAS in an office located inside the CBP Secondary Inspection Area at LAX.

23. Prior to her interview, SA Yoon and I advised THOMAS of her Miranda rights. THOMAS stated she understood her rights and agreed to speak with us.

24. During her interview, THOMAS stated she was offered $4,500.00 to make a trip to Australia to transport the suitcase in question. THOMAS stated a male acquaintance reached out to her stating he had a job for her. He told her that she could take a trip to Australia and all she would need to do is transport a suitcase. THOMAS stated she believed the bag was packed with marijuana.

25. After THOMAS agreed to transport the suitcase, the male acquaintance introduced her to another individual via a group text. The two individuals arranged for THOMAS' travel from Atlanta, Georgia to Los Angeles, and from Los Angeles to Australia. They also paid for her Los Angeles hotel and sent a driver to drive her from her Los Angeles hotel to LAX in advance of her scheduled flight to Australia.

26. THOMAS stated the two individuals who coordinated her travel directed THOMAS to send them pictures during her drive to LAX and after she checked her bag. THOMAS complied.

**C. THOMAS Messaged Her Co-Conspirators About Transporting The Suitcase Using The SUBJECT DEVICE.**

27. During her Mirandized interview, THOMAS consented verbally and in writing to a search of the SUBJECT DEVICE. THOMAS also provided the passcode to the SUBJECT DEVICE and provided her phone number.

28. I visually and manually searched the SUBJECT DEVICE. Based on my review of the SUBJECT DEVICE, there appeared to be a Signal group chat that contained messages between THOMAS and her co-conspirators regarding THOMAS' transportation of the suitcase, as well as screen shots of Cash App transactions showing the co-conspirators transferring money to THOMAS.

29. We terminated THOMAS' interview at approximately 1:59 a.m.

**D. THOMAS Possessed The SUBJECT DEVICE**

30. THOMAS possessed the SUBJECT DEVICE on her person at the time of her arrest and told CBP officers it belonged to her.

## V. TRAINING AND EXPERIENCE ON DRUG OFFENSES

31. Based on my training and experience and familiarity with investigations into drug trafficking conducted by other law enforcement agents, I know the following:

   a. Drug trafficking is a business that involves numerous co-conspirators, from lower-level dealers to higher-level suppliers, as well as associates, to process, package, and deliver the drugs and launder the drug proceeds. Drug traffickers often travel by car, bus, train, or airplane, both domestically and to foreign countries, in connection with their illegal activities to meet with co-conspirators, conduct drug transactions, and transport drugs or drug proceeds.

   b. Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the manufacture, transportation, ordering, sale and distribution of illegal drugs. The aforementioned records are often maintained where drug traffickers have ready access to them, such as on their cell phones and other digital devices.

   c. Communications between people buying and selling drugs take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices. This includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring weapons to a deal. In addition, it is common for people engaged in drug trafficking to have photos and videos on their cell phones of drugs they or

others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales.

   d. Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices.  Drug traffickers often keep records of meetings with associates, customers, and suppliers on their digital devices, including in the form of calendar entries and location data.

   e. Drug traffickers often maintain on hand large amounts of United States currency to maintain and finance their ongoing drug trafficking businesses, which operate on a cash basis.

## VI.   TRAINING AND EXPERIENCE ON DIGITAL DEVICES[2]

32.  As used herein, the term "digital device" includes the SUBJECT DEVICE.

33.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

---

[2] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

       a.    Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

       b.    Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

       c.    The absence of data on a digital device may be evidence of how the device was used, what it was used for, and

who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

        d.   Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

    34.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it can take a substantial period of time to search a digital device for many reasons, including the following:

        a.   Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.

        b.   Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

35.  Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VII.  CONCLUSION

36.  For all of the reasons described above, I submit that there is probable cause to believe that THOMAS has committed violations of 21 U.S.C. §§ 841(a)(1): Possession with Intent to Distribute Methamphetamine.  I further submit that there is probable cause to believe that the items listed in Attachment B, which constitute evidence, fruits, and instrumentalities of violations of the Subject Offenses, will be found in and on the SUBJECT DEVICE, as described in Attachment A.

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this __2__ day of
February, 2025.

_____
HON. MARGO A. ROCCONI
UNITED STATES MAGISTRATE JUDGE

13